# COURT OF APPEALS
## DECISION
## DATED AND FILED

## January 12, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2018AP183-CR**

Cir. Ct. No. **1993CF931541**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT I

---

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

GENERAL GRANT WILSON,

DEFENDANT-APPELLANT.

---

APPEAL from an order of the circuit court for Milwaukee County: M. JOSEPH DONALD, Judge. *Affirmed*.

Before Brash, P.J., Blanchard and White, JJ.

¶1  WHITE, J.  General Grant Wilson appeals an order from the circuit court[1] denying his motion for a new trial on the basis of ineffective assistance of counsel during his trial in 1993 in which the jury found him guilty of first-degree intentional homicide and attempted first-degree intentional homicide, both with the use of a dangerous weapon enhancer.  The circuit court determined that although Wilson's trial counsel was deficient, Wilson was not prejudiced by those deficiencies.  We affirm on the same basis.

¶2  This matter has been discussed in detail in prior decisions; therefore, we will limit our summary of the facts to those relevant to this appeal.  *See State v. Wilson*, 2015 WI 48, ¶11-46, 362 Wis. 2d 193, 864 N.W.2d 52.  Evania Maric was fatally shot as she sat in her car early in the morning on April 21, 1993.  Willie Friend had been with Maric in the car, but a witness saw him run away while shots were being fired.  Friend identified Wilson as the shooter to the police and testified to the same at trial.  Wilson was charged with first-degree intentional homicide while possessing a dangerous weapon for Maric's death and attempted first-degree intentional homicide while possessing a dangerous weapon for the shots fired at Friend.

¶3  Trial counsel attempted to pursue a theory of third-party perpetrator defense—that the motive and opportunity existed for Friend, in conjunction with his brother, Larnell Friend, to have arranged for and carried out Maric's murder.[2]  As

---

[1] Wilson's 1993 trial was conducted by the Honorable Victor Manion; we refer to him as the trial court.  Wilson's 2010 postconviction motion was heard and decided by the Honorable Jeffrey A. Conen; we refer to him as the postconviction court.  Wilson's postconviction motion that serves as the basis for this appeal was heard and decided by the Honorable M. Joseph Donald; we refer to him as the circuit court.

[2] We refer to Willie Friend as Friend and Larnell Friend, Willie Friend's brother, as Larnell.

part of this theory, trial counsel wanted to question Friend about the relationships among Maric, his brother, and himself, and to inquire about Maric's alleged attempts to terminate a prostitute/pimp relationship with either of them. However, the trial court rejected questioning along these lines because trial counsel had not sufficiently shown that this theory of defense was not mere speculation.

¶4     After both sides had rested, trial counsel investigated additional information to bolster proof of the third-party perpetrator defense. The trial court allowed the defense to reopen Wilson's defense for additional witnesses. The defense called Mary Larson, who testified that she had been friends with Maric since junior high. She had met both Wilson and Friend through Maric.

¶5     Over the State's objection, trial counsel made an offer of proof during the testimony of Mary Larson outside the jury's presence. Larson testified that approximately two weeks before the shooting, Larson, Friend, Maric, and another woman were in Larson's kitchen, and Friend said that he had to keep Maric in check, and that if he was not able to keep her in check, he would kill her. Larson also testified that Maric agreed that was true. Trial counsel argued that this evidence was relevant to show that Friend was involved in Maric's death because he had made previous threats and he was present at the scene. He argued this was direct evidence supporting the defense theory of a third-party perpetrator.

¶6     The trial court sustained the State's objection to admitting Larson's testimony on the ground that this third-party perpetrator theory would merely invite the jury to speculate. Further, the trial court expressed the view that Larson's testimony about Friend's statements would be inadmissible hearsay.

¶7      The trial court also denied trial counsel's request to recall Friend for additional questioning.  The jury ultimately returned guilty verdicts against Wilson on both counts.

¶8      After sentencing, the trial court denied Wilson's postconviction motion for a new trial.  In 2010, Wilson filed a petition for a writ of habeas corpus, alleging that his appointed appellate counsel had performed ineffectively.  We granted Wilson's petition and reinstated his postconviction and appellate rights under WIS. STAT. RULE 809.30 (2009-10).[3]  The postconviction court denied Wilson's motion for postconviction relief.

¶9      Wilson appealed and we reversed the judgment of conviction and the order denying postconviction relief and remanded for further proceedings.  *See State v. Wilson*, No. 2011AP1803-CR, unpublished slip op. (WI App Oct. 22, 2013).  However, our supreme court reversed our decision and denied Wilson a new trial.  *See Wilson*, 362 Wis. 2d 193, ¶90.  Although originally remitted to the circuit court, the State moved our supreme court to have the court of appeals address the other issues raised in Wilson's original appeal.

¶10     Subsequently, we remanded the case to the circuit court for a *Machner*[4] hearing on Wilson's claims of ineffective assistance of trial counsel.  The circuit court conducted three days of evidentiary hearings in May, June, and July 2017.  The defense called two of Maric's friends who testified at the original trial, Mary Larson and Barbara (Lange) Streeter.  Each testified that Maric worked as a prostitute and that Friend had threatened to kill Maric and physically abused her.

---

[3] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

[4] *See State v. Machner*, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979).

Streeter added that Maric seemed to want to stop working as a prostitute. The State elicited testimony clarifying that neither witness had personal knowledge of any physical abuse.

¶11 The defense called Willie Wilson, the defendant's brother, who testified that he lived with Wilson from about 1988 to 1992.[5] Willie testified that Maric visited Wilson at their shared residence frequently and sometimes other men picked her up there. Although Willie testified that he had heard that Larnell was Maric's pimp, he further explained that he did not have personal knowledge that Maric was a prostitute or that Larnell was her pimp. The defense also called Scott Hungerford, a private investigator who acted on behalf of Wilson during this appeal. Hungerford testified that he performed background checks including collecting criminal records for members of the Friend family and the victim; he testified that this information would have been available in 1993 if an investigator pursued it.

¶12 Wilson's trial counsel, Peter Kovac, testified in part as follows. Attorney Kovac's requests to delay the trial were denied; therefore, the parties went to trial just sixty-five days after the murder. He believed that Friend was the State's most important witness. Attorney Kovac testified about his initial hearsay objections to three instances when Friend purported to recount Maric's statements to Friend on the night of the murder: (1) identifying Wilson's car to Friend, (2) saying that Wilson was stalking her, and (3) saying that Wilson tried to run her off the road and threatened to kill her. The trial court admitted the first two statements over defense objection. Trial counsel withdrew his objection to the third. Attorney

---

[5] We refer to Willie Wilson, General Grant Wilson's brother, as Willie.

5

Kovac testified that he was wrong to withdraw his objection, but he thought that the judge might revisit it and withdrawing the objection might have an advantage.

¶13 The defense questioned trial counsel about his failure to make a stronger offer of proof on the third-party perpetrator defense by bringing in character evidence from Maric's family that she worked as a prostitute or that Maric's friends heard Friend threaten Maric. Attorney Kovac testified that he failed in his attempts to admit testimony that could allow him to damage Friend's credibility.

¶14 The circuit court issued a written decision denying Wilson's motion for a new trial, concluding that trial counsel's performance was deficient in various respects, but that his deficient performance was not prejudicial. This appeal follows. Additional facts will be supplied in the opinion.

**STANDARD OF REVIEW**

¶15 The right to counsel is constitutionally guaranteed to criminal defendants in the United States Constitution and the Wisconsin Constitution. U.S. CONST. amends. VI, XIV; WIS. CONST. art. I, § 7. The right to counsel includes the right to effective counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). In *Strickland*, the United States Supreme Court set forth a two-part test to determine whether trial counsel's assistance was ineffective to the extent that it violated the defendant's constitutional rights. *Id.* at 687. In one prong of the analysis, we examine whether the defendant has shown that that counsel's performance was deficient. *Id.*

¶16 The other prong of the inquiry, the one we consider dispositive here, is whether the defendant was prejudiced by counsel's performance. *Strickland*, 466

U.S. at 687. "Even if deficient performance is found, judgment will not be reversed unless the defendant proves that the deficiency prejudiced his defense." *State v. Johnson*, 153 Wis. 2d 121, 127, 449 N.W.2d 845 (1990). "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Our inquiry into prejudice focuses on the reliability of the adversarial process and fundamental fairness of the trial. *See State v. Pitsch*, 124 Wis. 2d 628, 642, 369 N.W.2d 711 (1985).

¶17 Whether there was a violation of a defendant's constitutional right to the effective assistance of counsel is a mixed question of law and fact. *See State v. Trawitzki*, 2001 WI 77, ¶19, 244 Wis. 2d 523, 628 N.W.2d 801. We will uphold the circuit court's findings of fact unless they are clearly erroneous. *See* WIS. STAT. § 805.17(2); *Pitsch*, 124 Wis. 2d at 634. The inquiry into whether a defendant received ineffective assistance of counsel, meaning counsel's performance was both deficient and prejudicial, is a question of law that we review independently without deference to the circuit court. *See State v. Hunt*, 2014 WI 102, ¶22, 360 Wis. 2d 576, 851 N.W.2d 434.

## DISCUSSION

¶18 Wilson asserts that his trial counsel provided ineffective assistance in three primary ways—failure to investigate and present the third-party perpetrator defense, failure to impeach Friend's credibility, and failure to object to hearsay— and that the cumulative effect of counsel's deficient performance was prejudicial to the outcome of the case. We assume without deciding that trial counsel's performance was deficient and conclude that Wilson fails to show prejudice.

¶19     Wilson's current arguments about how he could prove that Friend was involved in the killing do not differ dramatically from the third-party perpetrator defense arguments trial counsel made at trial.  There remains no solid evidence to prove that Friend was involved in arranging or hiring one or more persons to shoot Maric.  We are left with speculation as to what might be different at a new trial.  Although Wilson suggests many avenues to impeach Friend's credibility, he does not present facts that would undermine our confidence in the jury verdict.

¶20     Our supreme court concluded that the trial court did not err in excluding Wilson's third-party perpetrator defense because Wilson failed to make an adequate offer of proof that "Friend had the opportunity to kill Maric, directly or indirectly[.]"  *Wilson*, 362 Wis. 2d 193, ¶¶10, 86.  The court held that Wilson failed to show that Friend's opportunity to commit the crime was a "legitimate tendency" and not mere speculation, which excluded his third-party perpetrator defense under *Denny*.[6]  *Wilson*, 362 Wis. 2d 193, ¶83.  The court detailed the holes in the evidence proffered by Wilson's trial counsel in support of Wilson's third party perpetrator defense, namely "no evidence that Friend had the contacts, influence, and finances to quickly hire or engage a shooter or shooters to gun down a woman on a public

---

[6] As we explained in *Denny*,

> [T]o show "legitimate tendency," a defendant should not be required to establish the guilt of third persons with that degree of certainty requisite to sustain a conviction in order for this type of evidence to be admitted.  On the other hand, evidence that simply affords a possible ground of suspicion against another person should not be admissible.

*State v. Denny*, 120 Wis. 2d 614, 623, 357 N.W.2d 12 (Ct. App. 1984).  In *Denny*, we set forth a three-prong test that requires a defendant to show by the totality of the evidence that a third-party perpetrator had the motive, opportunity, and direct connection to the crime before the third-party defense may be presented to the jury.  *Id.* at 624.  "Although proffered evidence should be understood in the context of other evidence, the three prongs of the 'legitimate tendency' test are distinct from one another."  *State v. Wilson*, 2015 WI 48, ¶89, 362 Wis. 2d 193, 864 N.W.2d 52.  "[T]he *Denny* test is a three-prong test; it never becomes a one-or two-prong test."  *Id.*, ¶64.

street"; no evidence that Friend or associates "had access to a gold Lincoln Continental similar to Wilson's"; no evidence of "telephone records from Friend or Friend's brother's house that could have set up the time and place of the hit on short notice"; no evidence that Friend or his family owned or had access to ".44 and .25 caliber weapons"; and no evidence of whom Friend might have hired as the shooter. *Id.*, ¶85.

¶21     Our supreme court stated, "a convicted defendant may not simply present a laundry list of mistakes by counsel and expect to be awarded a new trial." *State v. Thiel*, 2003 WI 111, ¶61, 264 Wis. 2d 571, 665 N.W.2d 305.  Assuming, as Wilson argues, that trial counsel failed to adequately investigate Maric's life, the circumstances of the crime, the operations of Larnell's after-hours club, illegal activities at the club, and why the police did not search the club for the missing murder weapon, Wilson still fails to show that he could present evidence at a new trial that Friend had the contacts, influence, and finances to contract for Maric's murder.  We agree with the State that Wilson has still failed to provide evidence of opportunity by Friend—or any other third party—at the level of clarity dictated by the reasoning in *Wilson*.

¶22     Wilson argues that a jury at a new trial could reasonably infer that, because Larnell allegedly operated an after-hours club and was involved in prostitution, this meant that Friend or Larnell had the requisite contacts to arrange Maric's murder.  Without any additional evidence, we reject an assumption that the nature of an after-hours club and alleged involvement in prostitution raises a reasonable inference of the opportunity to arrange a murder on a city street at the level of clarity dictated by the reasoning in *Wilson*.

¶23    Wilson argues that, at a new trial with effective assistance, Maric's alleged work as a prostitute and Friend's threats against her would be central to the defense, and the jury would not have a rosy view of the relationship between Friend and Maric or the impression the shooting resulted from a lover's triangle among Friend, Maric, and Wilson. For this argument, Wilson relies in part on reasoning from *Simpson v. State*, 83 Wis. 2d 494, 511, 266 N.W.2d 270 (1978). However, we consider *Simpson* distinguishable here, because it focused on the admissibility of relevant evidence, as defined in WIS. STAT. ch. 904, not hearsay, as defined in ch. 908. *See id.*; *State v. Kutz*, 2003 WI App 205, ¶58 n.32, 267 Wis. 2d 531, 671 N.W.2d 660. The State also points out that Wilson is the accused, not Friend, and no case law supports applying *Simpson* to a third-party perpetrator defense.

¶24    Wilson contends that Friend's alleged intent to kill Maric would satisfy the motive aspect of the *Denny* test. The problem with this line of reasoning is that it does not fill in the missing evidence in Wilson's third-party perpetrator defense case required under the analysis we must apply under the reasoning in *Wilson*. We are still left with speculation about Friend's opportunity to arrange Maric's murder, even if this provides an alternate motive. We cannot assume or infer that because Maric was allegedly involved in prostitution and Friend was allegedly threatening and abusive to her that he had the ability to arrange her murder on a city street. That connection is still only speculative. We conclude Wilson has not shown that trial counsel could have satisfied the opportunity prong of the *Denny* test with better investigation or presentation under the *Wilson* standards.

¶25    Wilson fails to explain what trial counsel missed in his investigation of Friend and on what basis he could have impeached Friend's testimony. Wilson is correct that there are inconsistencies in the record about what occurred during the

10

hours before the shooting but none of them make Friend's testimony incredible or, if disproven, that a reasonable jury could only discount his account entirely.

¶26    Further, critically, none of those inconsistencies undermine the testimony of Carol Kidd-Edwards, who testified that she witnessed the shooting. At trial, she testified:

> I was sitting on the side of the bed putting on my last shoe. There rang out very, very loud gunshots, loud enough that [it] frightened me to the floor, because it's an old house.
>
> The windows are vibrating. The room is vibrating, and I'm not sure where the sound is coming from, so I took cover on the floor.
>
> What I believe, or can remember were consecutive fir[ing] of about maybe five shots that came one right behind the other.
>
> [Prosecutor:]  Can you tell me whether or not at any point in time you did look out the window to see what was going on in the street outside?
>
> [Kidd-Edwards:]  Immediately when the rhythm of the shots stopped, I instantly got to the window of my bedroom to look to see what was going on.
>
> ….
>
> From the point that I … got up off the floor and went to the window, as I observed [Friend] running from the car across the street, I also saw a man coming from my blind side, which is the passenger side of the car that I couldn't see. I saw a man coming from around out of my blind spot into view in front of the car, and then approach the car across the street where the car was still running.
>
> [Prosecutor:]  What was that man doing then?
>
> [Kidd-Edwards:]  As he was walking across the street, approaching the car, he was loading, top loading a gun.
>
> ….

11

> He went up to the driver's side of [Maric's] car across the street, and he stood there and he fired five or seven rounds into the car.

This highly probative, consistent testimony of a neutral observer had a powerful tendency to exclude Friend as the shooter and lent credence to Friend's innocence because her account matched the substance of Friend's testimony about the shooting.

¶27   Kidd-Edwards lived on the same street where Larnell operated the after-hours club and where Maric was killed. She testified that she watched the shots fired from her bedroom window and she recognized Friend running away without "any objects in his hand." She heard Friend pound on her front door, yell to call 911, and wait at the scene for the police. Kidd-Edward's testimony, as credited by the jury, clears Friend from direct involvement in the shooting. Therefore, we are again faced with the missing opportunity evidence. It strains credibility to imagine that Friend organized a conspiracy to murder Maric that placed him in danger from the shooting, but he still ran for help and yelled for someone to call 911, and he remained on the scene for help to arrive. There are minor inconsistencies between the accounts of Friend and Kidd-Edwards—primarily as to whether the shooter exited the driver's side or passenger side of the gold Lincoln—but those minor inconsistencies do not implicate Friend and do not undermine the credibility of either Friend or Kidd-Edwards. None of the inconsistencies cited by Wilson tend to show that Friend had an opportunity to commit or arrange Maric's shooting by an unknown third party.

¶28   Wilson suggests that it would be significant at a new trial if trial counsel were to object to Friend's hearsay statement that Maric told him at the after-hours club that night that Wilson tried to run her off the road and threatened to kill

her if he saw her with Friend again. The problem with this argument is that Maric's statement is plainly admissible under the excited utterance exception. *See* WIS. STAT. § 908.03(2). The excited utterance exception is predicated on the "sufficient trustworthiness" the rules of evidence accord to statements mean under "spontaneity and stress[.]" *State v. Huntington*, 216 Wis. 2d 671, 681-82, 575 N.W.2d 268 (1998) (citation omitted). Out-of-court statements about a startling event or condition when made under the stress of excitement caused by the event or condition are admissible as an exception to the hearsay rule. *Id.* (citation omitted). The State argues compellingly that Friend's account of Maric's statement complies with these requirements and that the exception would likely be applied at a new trial.

¶29 Wilson argues that the cumulative effect of trial counsel's deficiencies prejudiced his defense, but this does not add anything to arguments we have already rejected. The ultimate question is whether there was a substantial likelihood of a different outcome but for trial counsel's presumed deficient performance. Reviewing the record and seeing little to no proof on the issue of Friend's opportunity at the level of clarity dictated by the reasoning in *Wilson*, we cannot conclude there is a reasonable possibility of a different outcome if trial counsel's performance had been sufficient. When we apply the *Wilson* standards, we remain confident in the fairness of the trial process and outcome. Wilson's theory that Friend conspired to murder Maric remains speculative under these standards. He has failed to show what evidence trial counsel did not find and present at trial that would have made a difference. Therefore, Wilson has failed to show that trial counsel deprived him of a true defense and accordingly we conclude that, even assuming deficient performance, Wilson was not denied the effective assistance of trial counsel.

¶30 For the foregoing reasons, we affirm the trial court.

*By the Court.*—Order affirmed.

Not recommended for publication in the official reports.

No.    2018AP183-CR(D)

¶31    BRASH, P.J. (*dissenting*).  I disagree with the Majority's conclusion that Wilson did not receive ineffective assistance of counsel.  The Majority affirms the circuit court's determination that even with the numerous significant deficiencies made by trial counsel during Wilson's trial—which were identified and acknowledged at the *Machner* hearings—Wilson did not suffer prejudice as a result of those deficiencies.

¶32    On the contrary, I believe that the cumulative effect of those deficiencies was prejudicial to Wilson's defense and, had they not been committed, there is a reasonable probability that the outcome of Wilson's trial would have been different.  Because of this lack of confidence in the outcome, I would remand this matter for a new trial.  Therefore, I respectfully dissent.

*Procedural History*

¶33    As alluded to in the Majority opinion, this case has a complicated procedural history which, in and of itself, is indicative of the cumulative prejudice that occurred here.  To begin, the seven-day jury trial in 1993 commenced just sixty-eight days after the crimes occurred, despite repeated requests by Wilson's trial counsel, Attorney Kovac, to delay the trial to allow him more time to prepare.

¶34    At the trial, the State argued that this was a crime of passion:  Wilson killed Maric and tried to kill Friend because they were romantically involved and Wilson was jealous.  In contrast, Attorney Kovac's theory of defense was that Wilson did not commit the crimes; rather, Friend, who was the only person linking Wilson to the crimes, and/or his brother Larnell, were the culprits.  However,

Attorney Kovac did not file a pretrial motion requesting permission from the trial court to admit third-party perpetrator evidence under *State v. Denny*, 120 Wis. 2d 614, 357 N.W.2d 12 (Ct. App. 1984). *Denny* provides that a defendant may introduce third-party perpetrator evidence only if the defendant establishes that the third party had a motive to commit the crime, an opportunity to do so, and a direct connection to the crime. *See id.* at 624. Because Attorney Kovac did not present an adequate offer of proof before or during the trial regarding the third-party perpetrator evidence, the trial court did not allow the evidence to be presented to the jury. The jury was initially unable to reach a verdict. After being told to continue to try to reach a verdict, the jury convicted Wilson of the crimes.

¶35 Seventeen years after Wilson's conviction, his right to a direct appeal was reinstated.[1] This appeal is the third time this case has been before us and is a continuation of Wilson's direct appeal from the 1993 conviction under WIS. STAT. RULE 809.30. As noted in the Majority opinion, the first time the case was before us, we reversed and remanded for a new trial. *See State v. Wilson*, No. 2011AP1803-CR, unpublished op. and order (WI App Oct. 22, 2013). We concluded that Wilson was denied a meaningful opportunity to present a complete defense during his trial because the trial court did not allow him to introduce third-party perpetrator evidence pertaining to Friend and/or Larnell. *See Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *Denny*, 120 Wis. 2d at 614.

¶36 Again as stated by the Majority, the Wisconsin Supreme Court reversed our decision. It ruled that the trial court properly excluded the third-party

---

[1] Wilson's right to a direct appeal was reinstated on September 14, 2010, on the grounds that Attorney Kovac provided him with ineffective assistance of appellate counsel. *See State ex rel. Wilson v. Humphreys*, No. 2010AP1074-W, unpublished op. and order (WI App Sept. 14, 2010). The Office of Lawyer Regulation publicly reprimanded Attorney Kovac in 2008 for violating multiple rules of professional conduct while representing Wilson.

perpetrator evidence under *Denny* because Wilson had not shown that Friend or his brother had an opportunity to commit the crime. *See Wilson*, 362 Wis. 2d 193, ¶86. The Wisconsin Supreme Court's decision reaffirmed the *Denny* test for the admission of third-party perpetrator evidence. *See Wilson*, 362 Wis. 2d 193, ¶52.

¶37 The Wisconsin Supreme Court remitted the case to the trial court on August 4, 2015. Several months later, the State moved the Wisconsin Supreme Court to vacate its remittitur and remand to this court to allow us to address the other issues raised in Wilson's brief, which we did not reach in the first appeal. The Wisconsin Supreme Court vacated its remittitur on November 4, 2015, and remanded to this court to address the remaining issues pending in this appeal.

¶38 On November 15, 2016, we reversed the order denying postconviction relief and remanded the matter, concluding that Wilson was entitled to a *Machner* hearing on his claim of ineffective assistance of trial counsel. *See State v. Wilson*, No. 2011AP1803-CR, unpublished op. and order (WI App Nov. 15, 2016). The circuit court held three evidentiary hearings and concluded that Attorney Kovac had performed deficiently. However, the circuit court also concluded that Attorney Kovac's deficient performance did not prejudice Wilson's defense. It is that decision that underlies this appeal.

## *Machner* Hearings

¶39 The Wisconsin Supreme Court's decision and this court's prior decisions set forth the facts of this case as developed prior to the *Machner* hearings. *See Wilson*, 362 Wis. 2d 193, ¶¶4-39; *Wilson*, No. 2011AP1803-CR (WI App Oct. 22, 2013; *Wilson*, No. 2011AP1803-CR (WI App Nov. 15, 2016). Those hearings took place in May, June, and July 2017, twenty-four years after Wilson's

3

conviction. There were six witnesses and more than three hundred pages of testimony. The circuit court made the following findings of fact:

1. Attorney Peter Kovac represented Wilson in the trial for the shooting death of Maric.

2. Attorney Kovac's theory of defense was that Friend either shot Maric or that there was a plot involving Friend and/or his brother to have her killed.

3. Attorney Kovac did not file a motion before trial for the admission of third-party perpetrator evidence under *Denny*.

4. Attorney Kovac did not investigate sufficient facts to support the admission of third-party perpetrator evidence under *Denny*.

5. The trial court denied Attorney Kovac's request to allow the third-party perpetrator evidence after hearing a verbal offer of proof based on a possible motive concerning Friend and/or Larnell and an offer of proof (made after the close of the defense's case) based on what two close friends of Maric, Mary Larson and Barbara Streeter, heard and observed about Friend.

   The circuit court added a footnote to this factual finding that stated that Mary Larson and Barbara Streeter testified that four or five weeks before Maric's death, when Friend came to Larson's house with Maric, they were all in the kitchen and Friend had a gun sticking out of his pants. He announced that Maric was going to do what he said or he would "pop" her and would not think twice about it. After this incident a couple weeks later, Larson said that she saw signs of abuse on Maric's back and Maric told her that it was done by Friend. Barbara Streeter testified that Friend said, after Maric stated that she was "done" with prostitution, "well, you ain't stopping. I'm gonna keep all my bitches in check."

6. Mary Larson testified that three weeks before Maric's death, she saw welts on Maric's back (presumably the abuse referenced in the circuit court's footnote discussed above), which Maric told her had come from physical abuse perpetrated by Friend.

7. Barbara Streeter testified that she remembered Mary Larson telling her that Friend beat Maric with a hanger.

4

8. Mary Larson testified at trial but was not permitted to testify about Friend as set forth above.[2]

9. Attorney Kovac did not question the State's ballistics expert about distinctions between a .44 caliber Sturm Ruger (murder weapon) and a .44 caliber Smith & Wesson (which Wilson stated he once owned).

10. Attorney Kovac never told the jury that Wilson's .44 caliber revolver was not the same make as the .44 caliber revolver that was determined to have killed Maric.

11. The State sought permission to allow Friend to testify that Maric told him several hours before the murder that Wilson had just driven her off the road and threatened to kill her by pointing a gun at her if she did not stop seeing Friend. The trial court ruled the statement inadmissible. The statement was admitted after Attorney Kovac withdrew his objection. He explained that he did so because he believed the trial court would reconsider.

12. Attorney Kovac did not use lab or medical evidence during his cross-examination of Friend.

¶40     In addition, the State notes in its brief that the following facts were demonstrated:  (1) Maric worked as a prostitute for Friend and/or Larnell; (2) Maric wanted to stop working as a prostitute; (3) Friend physically and emotionally abused and threatened Maric before her death; (4) Friend and Larnell had criminal records; (5) Maric was murdered outside of Larnell's after-hours club; (6) such clubs can be hotbeds of criminal activity.[3]

---

[2] At trial, the only testimony that Larson was permitted to give was that she knew both Wilson and Friend through Maric, and Maric was not afraid of Wilson.  Larson was not allowed to testify about Friend or her observations about the relationship between Maric and Friend.

[3] These facts were testified to by multiple people and were undisputed.

5

**DISCUSSION**

¶41     As we know, the *Strickland* test requires a defendant to prove both that counsel's performance was deficient, and that this deficient performance was prejudicial. *See id.*, 466 U.S. at 687. After making the above factual findings based on the evidence from the *Machner* hearings, the circuit court found that Attorney Kovac's performance was "deficient in various respects[.]" However, the court found that Wilson had not been prejudiced by those deficiencies.

¶42     I disagree. Although individual errors at trial may not necessarily require reversal, their cumulative effect can prejudice a defendant by undermining a court's confidence in the outcome of the trial. *See Thiel*, 264 Wis. 2d 571, ¶59. This is because "'the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial.'" *Id.*, ¶62 (quoting *United State v. Cronic*, 466 U.S. 648, 658 (1984)). "This inquiry directs analysis on the issue of prejudice to *the effect* of deficient performance on the overall reliability of the trial" which is a "substantively different focus from an overall assessment of an attorney's performance." *Thiel*, 264 Wis. 2d 571, ¶62.

*Third-Party Perpetrator Evidence*

¶43     I begin the inquiry into cumulative prejudice with Attorney Kovac's failure to properly investigate the third-party perpetrator evidence. Counsel has a duty to undertake "reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Attorney Kovac did not adequately investigate and prepare his third-party perpetrator defense before trial. He explained at the *Machner* hearing that he did not more thoroughly investigate before trial or file a formal motion before trial

6

because he thought the third-party perpetrator evidence was clearly admissible under **Denny**. However, according to **Strickland**, Attorney Kovac's failure to investigate and more adequately prepare his theory of defense constituted deficient performance. *See id.*, 466 U.S. at 691.

¶44    To determine the impact of this deficient performance on Wilson's defense, we look at what Attorney Kovac's unsuccessful offer of proof showed vis-à-vis the legal standard for admission of third-party perpetrator evidence and compare it to what his offer of proof would have shown if Attorney Kovac had adequately investigated and prepared.

¶45    As previously noted, for admission of third-party perpetrator evidence, a defendant must establish that there was a "legitimate tendency" that the third party "*could have* committed the crime," by demonstrating that the third party had a motive to commit the crime, an opportunity to do so, and a direct connection to the crime.[4]  *See Denny*, 120 Wis. 2d at 623-24 (emphasis added). The **Denny** criteria balance the tension that exists between a defendant's fundamental constitutional right to present witnesses on his or her behalf and the imperative that evidence must be relevant to the issues being tried. *Id.* at 622-23.

¶46    The Wisconsin Supreme Court concluded that Attorney Kovac's unsuccessful offer of proof regarding the third-party perpetrator evidence at trial was properly excluded under **Denny** because Wilson had not shown that Friend

---

[4]  As noted by the Majority, the legitimate tendency test does not require the defendant to "establish the guilt of third persons with that degree of certainty requisite to sustain a conviction" in order for third-party perpetrator evidence to be deemed admissible. *See Denny*, 120 Wis. 2d at 623.

7

and/or his brother had *the opportunity* to kill Maric.[5] The opportunity prong asks whether "the evidence create[d] a practical possibility that the third party committed the crime[.]" *Wilson*, 362 Wis. 2d 193, ¶58. The court explained that for a defendant to meet the opportunity prong of the *Denny* test, the defendant must show that "the third party had the realistic ability to engineer such a scenario," or, as applied here, "had the contacts, influence, and finances" to arrange for a shooter or shooters to kill Maric. *See Wilson*, 362 Wis. 2d 193, ¶¶85, 90.

¶47 The Wisconsin Supreme Court noted that Attorney Kovac's unsuccessful offer of proof during trial was as follows: (1) Mary Larson said that she knew Maric, Wilson, and Friend; (2) Larson said when Friend and Maric were at her house in the kitchen in the weeks before Maric's murder, Friend told Larson that "he had to keep [Maric] in check," and further, that "if she wouldn't be in check, he'd kill her, and she knew it"; (3) Larson said that Maric responded to Friend's comment by saying "yes, he would"; and (4) Larson said that she saw Friend slap Maric in a motel room. *Wilson*, 362 Wis. 2d 193, ¶37.

¶48 The trial court rejected Larson's testimony, in part because it believed it was hearsay. However, Friend's statements to Larson were not hearsay; rather, they were prior inconsistent statements by a witness who could have been questioned about them during his testimony. *See* WIS. STAT. § 908.01(4)(a)(1).

¶49 The trial court also rejected Larson's testimony as being too speculative. However, the *Machner* hearing testimony and exhibits demonstrated significant additional facts: (1) Maric worked as a prostitute; (2) Friend and/or Larnell were her pimps; (3) Maric wanted to stop working as a prostitute; (4) Friend

---

[5] The Wisconsin Supreme Court noted that the State conceded that Attorney Kovac met the motive and direct connection prongs of the *Denny* test. *See Wilson*, 362 Wis. 2d 193, ¶73.

beat Maric and threatened to kill her if she stopped working as a prostitute in the weeks before she was killed; (5) Larnell's after-hours club, in front of which Maric was killed, was known for prostitution; (6) the after-hours club used a metal detector to screen patrons, suggesting that persons carrying weapons frequented the establishment; (7) Friend, Larnell, and Marshall Friend—a brother of Friend and Larnell—were all were at the after-hours club when Maric was killed; and (8) Friend, Larnell, and Marshall had extensive criminal records and were known to police.

¶50 These facts go well beyond the unsuccessful offer of proof Attorney Kovac made at trial. However, the circuit court still deemed the evidence to be too speculative. I disagree. The nature of the relationship between Friend and Maric is a significant fact in this case. Friend testified at trial that he had known Maric for about twelve years and had been in an intimate relationship with her since the summer prior to her death.[6] On the contrary, the evidence from the *Machner* hearing demonstrated that Friend and/or Larnell were Maric's pimps—a much different type of relationship, and one that would not have supported the State's theory of the case. Indeed, by definition, the relationship between a pimp and

---

[6] Wilson also testified regarding his relationship with Maric. Wilson stated that he met Maric in 1988 and had maintained a relationship with her until the time of her death. He said that they had a good relationship, they were both dating others, and they were open about this with each other. Attorney Kovac introduced nine taped phone messages the State had seized from Wilson's telephone answering machine that Maric left Wilson in the ten days before her murder, the last of which was only two days before she died. In the messages Maric seems at ease, makes casual conversation, and states that she loves Wilson "madly" and misses him because he had been away on vacation. Wilson testified that he had never been to the after-hours club, but that Maric had pointed it out to him when they drove by it one time, and told him that if "something ever happened to [me] that … would be the place."

prostitute is one of power: the pimp obtaining and keeping power over the prostitute.[7]

¶51 Although the State previously conceded that the direct connection and motivation prongs of *Denny* were met, *see Wilson*, 362 Wis. 2d 193, ¶73, I point out that this evidence clearly provides a direct connection between Friend and Maric outside of the fact that he was with her when she was killed. Additionally, when taken together with the *Machner* evidence that Maric wanted to stop being a prostitute, a strong motive for killing Maric is established.

¶52 Furthermore, "[s]ome evidence provides the foundation for other evidence"; that is, "'[f]acts give meaning to other facts,' and certain pieces of evidence become significant only in the aggregate, upon the proffer of other evidence." *Wilson*, 362 Wis. 2d 193, ¶53 (citation omitted). The additional evidence from the *Machner* hearings gives meaning to the facts in the failed offer of proof that are sufficient to establish a "legitimate tendency" that Friend had the opportunity to arrange Maric's killing. *See Wilson*, 362 Wis. 2d 193, ¶56.

¶53 To expound on this point, I note that our supreme court in *Wilson* focused on the improbability of Friend being able to "quickly hire or engage a shooter" and "set up the time and place of the hit on short notice." *See id.*, ¶85. However, it is unclear why this was necessarily a last-minute plan. The threatening exchange witnessed by Larson occurred weeks before Maric was killed, giving Friend and/or Larnell plenty of time to form a plan. This plan could have been as simple as arranging for Larnell or an associate to shoot Maric the next time she

---

[7] *Pimp*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/pimp (last visited Dec. 9, 2020).

visited the after-hours club, which was owned by Larnell, and was known for criminal activity that attracted armed individuals.[8]

¶54  Thus, when all of the facts that came to light during the *Machner* hearing are viewed "in the aggregate," they demonstrate a legitimate tendency that Friend and/or Larnell "had the contacts, influence, and finances" to arrange for a shooter or shooters to kill Maric.  *See Wilson*, 362 Wis. 2d 193, ¶¶53, 85. Furthermore, we only have Friend's word regarding the events that led up to the shooting; with the introduction of the facts regarding the true nature of his relationship with Maric, his credibility likely would have been called into question.

¶55  Moreover, our supreme court in *Wilson* noted that in a *Denny* analysis, the "strength and proof of a third party's motive to commit the crime" may be "so strong that it will affect the evaluation of the other prongs."  *Wilson*, 362 Wis. 2d 193, ¶64.  I believe that to be the case here; in fact, both the motive and direct connection prongs are sufficiently strong to bolster Wilson's theory of the involvement of either Friend and/or Larnell to beyond "mere speculation."  *Id.*, ¶59. Indeed, to succeed with a *Denny* motion, a defendant "need not establish the guilt of the third party to the level that would be necessarily to sustain a conviction." *Wilson*, 362 Wis. 2d 193, ¶51.

---

[8] In contrast to this possible scenario, I note Wilson's testimony at trial regarding his actions on the night of the shooting.  He said that he had met Rosanne Potrikus at a bar where she worked that night, helped her close the bar, and then drove around with her and went to get food. Wilson testified to the details of their activities, which were corroborated by Potrikus's testimony. Wilson testified that he then took Potrikus back to her car—which they had left at the bar where she worked—drove behind her to the freeway, and that he proceeded home, arriving between 3:30 a.m. and 4:00 a.m.  He testified that he woke at 5:15 a.m. for work and called Potrikus at around 5:30 a.m. because she had made an unsolicited request that he call her to wake her up for work.  Wilson testified that he then went to work at 7:00 a.m. at Krause Milling, where he had worked for sixteen years, was the senior miller for the production department, and a union steward. Phone records introduced at trial established that Wilson called Potrikus from his home at 5:33 a.m.

¶56 Another factor to consider in a **Denny** analysis is that "[o]verwhelming evidence against the defendant may not serve as the basis for excluding evidence of a third party's opportunity" to commit the crime. **Wilson**, 362 Wis. 2d 193, ¶69. "[B]y evaluating the strength of only one party's evidence, no logical conclusion can be reached regarding the strength of contrary evidence offered by the other side to rebut or cast doubt." *See **Wilson***, 362 Wis. 2d 193, ¶69 (quoting **Holmes v. South Carolina**, 547 U.S. 319, 331 (2006)).

¶57 This legal framework under which the additional evidence adduced at the **Machner** hearing is analyzed is key. We must focus on the probative value of the evidence *to the defense*; that is, we look at whether the evidence would have helped cast reasonable doubt on the State's case. *See **Wilson***, 362 Wis. 2d 193, ¶69. Clearly, the third-party perpetrator evidence would have helped to cast doubt on the State's narrative that this was a crime of passion committed by a spurned lover.

¶58 Furthermore, in addition to failing to *investigate* and *prepare* a third-party perpetrator defense, Attorney Kovac performed deficiently by failing to move the court for permission to introduce **Denny** evidence *before* trial so that he could have framed Wilson's defense differently if the evidence was not allowed. A review of the trial transcripts shows that Attorney Kovac had no coherent defense strategy to present to the jury. Instead, he was left repeatedly referring to evidence he was not allowed to present.

¶59 In assessing prejudice, we focus on "*the effect* of deficient performance on the overall reliability of the trial." *See **Thiel***, 264 Wis. 2d 571, ¶62. Attorney Kovac's failure to present a coherent defense harmed Wilson. Furthermore, had Attorney Kovac timely submitted a thoroughly investigated **Denny** motion prior to trial that was still rejected, he would have known that the

12

third-party defense involving Friend and/or his brother was unavailable to him, and could have pursued another defense strategy. Therefore, under either scenario, Wilson's defense was prejudiced by Attorney Kovac's deficiencies relating to the third-party perpetrator evidence.

*Other Deficiencies*

¶60 Another prejudicial deficiency committed by Attorney Kovac involves his withdrawal of his successful objection to a hearsay statement. Before Friend testified, the State sought permission to admit several hearsay statements through him. One of the statements was that Maric allegedly told Friend that Wilson had tried to run her off the road several hours before the murder, then pointed a gun at her and told her that if he saw her with Friend again, he was going to kill her. After the circuit court ruled *in favor of the defense excluding the statement*, Kovac withdrew his successful objection.

¶61 The State went on to repeatedly use the statement against Wilson. On direct examination, Friend testified that Maric came to the after-hours club to tell him that Wilson had tried to run her off the road and threatened to kill her if he saw her with Friend. Attorney Kovac compounded the problem with a lengthy cross-examination about the statement, giving it more attention before the jury. The State then emphasized the statement during its closing argument, pointing to it as evidence of Wilson's intent:

> How do we know it was intentional homicide? I submit to you … the statement that he is attributed to have made to Evania Maric when he ran her off the road. If I see you with that nigger again, I'm going to kill you both.

¶62 Attorney Kovac's decision to withdraw a successful objection to damaging testimony against his client constituted deficient performance. Moreover,

13

this emotionally charged evidence damaged Wilson's defense because it was the only evidence that Wilson ever threatened Maric and it bolstered the State's theory that Wilson killed Maric and attempted to kill Friend in a crime of passion.

¶63     The Majority asserts that Wilson suffered no prejudice as a result of Attorney Kovac's error because the trial court had erroneously sustained his objection, and that the excited utterance did indeed apply to render the statement admissible, citing the compelling argument of the State regarding this issue. Majority op., ¶28. The Majority also cites to *Huntington* and the three requirements established therein for admitting an excited utterance in support of this conclusion. *See id.*, 216 Wis. 2d at 681-82.

¶64     The admission of out-of-court statements pursuant to an exception to the hearsay rule is a discretionary decision left to the trial court. *Id.* at 680. We do not overturn such a decision if we can "discern a reasonable basis" for that decision, "[b]ecause the [trial] court is better able to weigh the reliability of circumstances surrounding out-of-court statements[.]" *Id.* at 680-81.

¶65     The *Huntington* court explained that the basis for the excited utterance exception, set forth in WIS. STAT. § 908.03(2), is "'spontaneity and stress' which, like the bases for all exceptions to the hearsay rule, 'endow such statements with sufficient trustworthiness to overcome the reasons for exclusion of hearsay.'" *Huntington*, 216 Wis. 2d at 681-82 (citation omitted). In making its ruling sustaining Attorney Kovac's objection on this statement, the trial court did not believe that the statement met the requirements of an excited utterance because of the time that had elapsed between when the incident allegedly occurred and when Maric purportedly told Friend about it. The trial court found that this time lapse

demonstrated that Maric had "thought about it and had time to reflect on it." This is a reasonable basis for the trial court's ruling. *See **id.*** at 680-81.

¶66 In any event, the trial court's decision regarding this evidence is not the issue under consideration here. Rather, it is the effect that Attorney Kovac's error in withdrawing his objection had on Wilson's defense, and I conclude that this error added to the cumulative prejudice that harmed Wilson's defense.

¶67 Continuing with Attorney Kovac's deficiencies, he did not draw for the jury the distinction between the murder weapon and the gun Wilson told the police he previously owned. The State's ballistics expert, Monty Lutz, testified that Maric was killed with .44 caliber bullets from a Sturm Ruger revolver, not a Smith & Wesson revolver, which was the make of gun that Wilson said he previously owned. The prosecutor repeatedly argued that Wilson used to own, but no longer had in his possession, a .44 caliber gun. Attorney Kovac failed to ask Lutz about the differences between a .44 caliber Sturm Ruger and a .44 caliber Smith & Wesson.

¶68 More importantly, Attorney Kovac never *told the jury* that the .44 caliber revolver Wilson admitted previously owning and bartering away *was not the same make* as the .44 caliber revolver that killed Maric. Attorney Kovac's failure to draw for the jury the distinction between the murder weapon and the gun Wilson said he previously owned constituted deficient performance. Moreover, it harmed Wilson's defense because the jury was left to wonder whether Wilson killed Maric with his Smith & Wesson, which was not the murder weapon according to the ballistics experts.

¶69 Another deficiency to note is Attorney Kovac's failure to call a witness relating to the vehicle driven by the shooter or shooters—the gold-toned

15

Lincoln Continental. At the *Machner* hearing, Wilson introduced a police report of an interview with Clyde Edwards conducted immediately after Maric's murder. Edwards is the husband of Kidd-Edwards, and lived at the same residence across from the after-hours club.

¶70 The police report states that Edwards told the police on the day of the murder that he had noticed the vehicle described by his wife, the gold-toned Lincoln Continental, in the area *before* Maric was killed. This is important because Friend testified that Wilson had never been to the after-hours club before the murder and the State argued that the fact that a gold-toned Lincoln Continental was present at the scene of the crime was strong evidence of Wilson's guilt. In fact, Attorney Kovac attempted to show at trial through other means that there *were* other gold-toned Lincoln Continentals in the area to cast doubt on the proposition that the shooter or shooters were in *Wilson's* car.

¶71 The Wisconsin Supreme Court noted that Attorney Kovac had not shown in his unsuccessful offer of proof that the third-party perpetrator evidence was admissible under *Denny* because, among other things, he had not shown that Friend, Larnell, or their alleged unnamed associates had access to a gold Lincoln Continental similar to Wilson's car. *See Wilson*, 362 Wis. 2d 193, ¶85. After the *Machner* hearing, the circuit court made no explicit findings of fact on this issue—the hearings were quite broad in scope—but it is a matter of record that Attorney Kovac did not call Edwards to testify at trial. The testimony of Edwards would have helped in filling that hole in the evidence.

¶72 Instead, Attorney Kovac focused on Kidd-Edwards' testimony regarding a gold Lincoln Continental that she saw at the shooting scene. Prior to trial, Kidd-Edwards had indicated to an investigator hired by Attorney Kovac that

16

the license plate had three letters and three numbers. However, in her trial testimony, Kidd-Edwards was adamant that she did not remember whether she had seen the license plate.[9] Her testimony stands in stark contrast to Friend's statement to police immediately after the shooting, when he identified Wilson as the shooter, as well as providing a description of the gold Lincoln at the scene which included the license plate: a vanity plate that spelled "B-BALL." That license plate was then traced back to Wilson.

¶73 Wilson contends that there were additional deficiencies by Attorney Kovac, including errors and omissions in his cross-examination of Friend relating to inconsistencies in Friend's version of events which would likely have cast doubt on the credibility of Friend's testimony. Indeed, Friend's credibility was paramount to the State's case: he was the person who identified Wilson as the shooter; he provided the connection of the car seen at the shooting to Wilson; and he was the one who provided the motive for Wilson to commit the shootings, based on the purported statement of Maric that Wilson had threatened to kill Maric and Friend if he saw them together. In contrast, Kidd-Edwards, the State's witness who both the circuit court and the Majority found compelling, could not identify the shooter or corroborate the license plate.[10]

---

[9] Specifically, Kidd-Edwards testified that any information she had given to police about the license plate at the time of the shooting would have been accurate, because her "memory was fresh" at that time. However, there was no information about the license plate in the police report with her statement.

[10] I note that Kidd-Edwards' testimony was that she saw Friend running away from the car, but she did not see him being shot at, as she had dropped to her bedroom floor during the first round of shots. Additionally, evidence was presented that Wilson was a sergeant in the Army Reserves, where he had served for eighteen years, and that he was an expert marksman. Yet, Friend was able to escape unscathed during the shooting.

Again, we have only Friend's word regarding what happened prior to, and at the time of, those first five shots.

¶74 Therefore, it stands to reason that the jury placed significant weight on the evidence provided by Friend, and further, that this weight may have been affected if it had been considered in conjunction with Friend's true relationship with Maric—a fact that did not come out until the *Machner* hearings.

¶75 In sum, I agree with Wilson that "the magnitude of Kovac's deficiencies was extraordinary." "Just as a single mistake in an attorney's otherwise commendable representation may be so serious as to impugn the integrity of a proceeding, the cumulative effect of several deficient acts or omissions may, in certain instances, also undermine a reviewing court's confidence in the outcome of a proceeding." *Thiel*, 264 Wis. 2d 571, ¶60. Attorney Kovac's numerous errors and omissions, both large and small, prejudiced the defense to an extent that it rendered the reliability of this proceeding suspect. Stated more simply, Wilson did not receive a fair trial.

¶76 Thus, I am persuaded that, but for the numerous, unreasonable errors of Wilson's trial counsel, there is a reasonable probability that the result of the proceeding would have been different. *See id.*, ¶81. Therefore, I would reverse and remand this matter for a new trial.